UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Sierra Club; Forest Watch; and
The Wilderness Society,
     Plaintiffs

     v.                       Civil No. 07-cv-257-SM
                            Opinion No. 2008 DNH 113
Thomas Wagner, White Mountain National
Forest Supervisor; Abigail Kimball,
U.S. Forest Chief; United States Forest
Service; Edward T. Schafer, Secretary,
U.S. Department of Agriculture; and
U.S. Department of Agriculture,
     Defendants

**O R D E R**

     Plaintiffs, the Sierra Club, Forest Watch, and The
Wilderness Society (collectively, the "Sierra Club"), bring this
action under the Administrative Procedure Act seeking declaratory
and injunctive relief.  Specifically, they seek a judicial
declaration that defendants (collectively, the "Forest Service")
violated the National Environmental Policy Act and the National
Forest Management Act when they approved two forest resource
management projects in the White Mountain National Forest: the
Than Forest Resource Management Project (the "Than Project") and
the Batchelder Brook Vegetation Management Project (the
"Batchelder Brook Project").

Appearing as amici curiae and urging the court to deny the Sierra Club the relief it seeks and to uphold defendants' approval of the Than and Batchelder projects, are the following entities:  The State of New Hampshire; The Society for the Protection of New Hampshire Forests; the Appalachian Mountain Club; the New Hampshire Timberland Owners Association; the North Country Council; and the Audubon Society of New Hampshire.[1]

Plaintiffs do not challenge the White Mountain National Forest Land and Resource Management Plan, which was implemented in 2005.  Nor do they directly challenge the merits of the two forest resource management projects at issue in this case (though they plainly do not approve of them).  Instead, plaintiffs assert that defendants failed to apply the proper statutory and regulatory standards when deciding whether to approve those projects.  Accordingly, the court is not called upon to consider either the wisdom or the propriety of the forest resource management projects at issue in this case.  Rather, the narrow

---

[1]    "Amicus curiae" is a Latin phrase meaning "friend of the court."  An amicus is not a party to the litigation and, therefore, does not necessarily represent the interests of any party.  Instead, the role of an amicus is to assist the court "in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision."  Newark Branch, N.A.A.C.P. v. Harrison, 940 F.2d 792, 808 (3d Cir. 1991).

legal question presented is whether defendants followed the
correct procedures and applied the correct statutory and
regulatory standards in approving those projects.  For the
reasons discussed below, the court concludes that they did.


**Background**

I.   <u>The White Mountain National Forest</u>.

The White Mountain National Forest ("WMNF") was established
under the Weeks Law of 1911, which authorized the Secretary of
Agriculture to purchase land for the National Forest System.  The
first land purchase for the WMNF occurred in 1914 and, since
then, the forest has grown to encompass nearly 800,000 acres in
northern New Hampshire and western Maine.  Among other things,
the WMNF contains 48 summits of 4,000 feet and higher, both
softwood and northern hardwood trees, and a wide variety of
plants, birds, fish, and other species.


The WMNF is administered by the Forest Service in accordance
with, and to achieve the objectives established in, the
comprehensive White Mountain National Forest Land and Resource
Management Plan (the "Forest Plan").  The Forest Plan is the
product of nine years of research and planning, as well as an
extraordinary level of public involvement.  The current Forest

Plan was adopted in September of 2005.  Among other things, it designates 34,500 acres as Recommended Wilderness and 358,000 acres as "General Forest Management Lands."  Within the General Forest Management Lands, approximately 281,000 acres are considered suitable for timber harvesting and, of that total, 97,400 acres (approximately one-third) are located within areas inventoried as "roadless" (discussed below).  The Forest Plan allows timber harvesting on approximately 3,400 acres annually, which is less than one-half of one percent of the overall acreage within the WMNF.  See Forest Plan, Appendix B, page B-4.

The WMNF is divided into 15 management areas.  Id. at page 3-2.  As to each, the Forest Plan identifies a purpose, the desired condition of the land, and the standards and guidelines for managing that land.  The Forest Plan is, then, somewhat analagous to a city's zoning ordinance.  The objectives of the Forest Plan and the goals established with respect to each of the 15 management areas are achieved by, among other things, implementation of site-level projects.  See generally Forest Plan, Preface at page v ("Relationship of the Forest Plan to Site-level Projects").  All forest management, including site-level projects, must comply with the provisions of the Forest Plan.  Under the Forest Plan, a site-level project's

4

environmental analysis "tiers" to the Forest Plan's Final
Environmental Impact Statement ("FEIS").  In other words, a
specific project's environmental analysis may incorporate, by
reference, the information in the FEIS, without the need to
reiterate it.

Shortly after the current Forest Plan was adopted in 2005,
the Forest Service began an on-the-ground evaluation to determine
what management actions were necessary to achieve the goals
established in the Forest Plan.  In the areas covered by the Than
and Batchelder Brook projects, the Forest Service identified a
need for a wider array of habitats, as represented by vegetation
of differing age-classes, including those in the youngest
category, known as early-successional stages.

II.  Inventoried Roadless Areas ("IRAs").

Areas within a national forest that are designated as
"roadless" meet certain minimum criteria and have characteristics
related to natural and wilderness values.  To meet the criteria
for roadless areas in the eastern United States, land must, among
other things, have the following characteristics: it has or is
regaining a natural, untrammeled appearance; improvements in the
area are being affected by the forces of nature (rather than

humans) and are disappearing or muted; the location of the area
is conducive to the perpetuation of wilderness values; the area
contains no more than one-half mile of improved road for each
1,000 acres; and twenty percent or less of the area has been the
subject of timber harvesting within the past 10 years.

As part of the recently-completed revision of the Forest
Plan, all land within the national forest was inventoried and
assessed to determine which of it qualified as "roadless" (also
known as "Inventoried Roadless Areas" or "IRAs").  That inventory
resulted in the recognition of 27 roadless areas within the WMNF,
totaling more than 403,000 acres (roughly one-half of the entire
national forest).  All of those IRAs also meet the criteria for
designation as Wilderness Areas.  See WMNF FEIS, page 2-7.  See
generally Forest Plan, pages 3-9 through 3-18.

Once an area has qualified as an inventoried roadless area,
it is evaluated to determine if it has characteristics consistent
with Wilderness.  Here, the Forest Plan recommended to Congress
that 34,500 acres within the WMNF be designated as Wilderness and
placed those lands into Management Area 9.1 ("Recommended
Wilderness") until their recent designation to the Wilderness
Preservation System.  The remaining roadless areas were assigned

6

to other management areas, based primarily on ecological classification and management history.  See, e.g., Batchelder Brook Environmental Assessment at 3-93.

One of the concerns expressed by the Sierra Club is that the proposed timber cutting under the Than and Batchelder Brook projects will adversely affect the nature and character of the land within the IRA's and, in so doing, disqualify it from eventual consideration as Wilderness.  Defendants deny that this is the case and say that even after the projects are complete, the areas will still possess all the characteristics essential to designation as "roadless" and will not be eliminated from future consideration as Wilderness Areas.

III.  The Than Forest Resource Management Project.

As noted above, the WMNF is divided into 15 Management Areas, each with a specific management emphasis.  The Than Project falls within an area designated as Management Area 2.1, or General Forest Management.  The Forest Plan lists four overarching management goals with respect to land designated Management Area 2.1, which are:

    1.   Provide high quality hardwood sawtimber and
         other timber products on a sustained yield
         basis;

7

2.    Provide a balanced mix of habitats for all
      wildlife species;

3.    Provide opportunities for a full mix of
      recreational opportunities on the Forest from
      low-use hiking trails to highly developed
      campgrounds, and meet ROS objectives varying
      from urban to semi-private motorized, in
      different locations and varying by season or
      presence of management activities; and

4.    Manage high-use or highly developed
      recreation areas to acceptable social and
      ecological standards; manage to retain some
      low-use and less developed areas.

Than Project Decision Notice, Than Vol. 3, Tab 5, page 2.[2]


In reviewing the land comprising the Than Project, the

Forest Service concluded that it was necessary to create forest

conditions that included a more diverse age class of vegetation.

According to the Forest Service, land within the Than Project, as

it presently exists, does not contain adequate young forest

stands, and softwood stands are under-represented.  Additionally,

the Forest Service concluded that it was necessary to improve the

_____

[2]      The administrative record in this case is voluminous.
It includes 15 binders of documents relating to the Batchelder
Brook Project, and 18 binders relating to the Than Project.  It
also includes several separately bound documents like, for
example, the Forest Plan, the FEIS, and the Assessment of
Terrestrial Biodiversity in the White Mountain National Forest.
References to particular documents in that record are to the
numbered binder in which they are located and the tab at which
they can be found (e.g., Than Vol. 6, Tab 2; B.B. Vol. 3, Tab 1).

habitat in the area by harvesting some of the mature and over-
mature northern hardwood stands, thereby making way for
regenerating stands of early-successional northern hardwoods.
The Service also determined that, to meet the habitat and stand
structure objectives established in the Forest Plan and
applicable to Management Area 2.1 lands, there was a need to
"release understory and co-dominant spruce, fir, and hemlock
trees from competing hardwoods in mixedwood stands.  Id. at pages
3-4.

     To accomplish those goals, several alternative proposals
were explored (including a proposal that would involve taking no
action whatsoever).  Ultimately, the Forest Service decided to
implement "Alternative 4," which is described in both the Than
Project Decision Notice and the Than Project Environmental
Assessment.  The Decision Notice describes Alternative 4 as
follows:

> [T]imber harvest will occur on approximately 929 acres,
> or approximately 6.5 percent of the analysis area.  An
> estimated 6.0 million board feet of timber will be
> removed from the 34 treatment units.  Up to 231 acres
> of early successional habitat will be created.  Needed
> access is provided by three existing road systems
> (Forest Roads 233, 512, and 5555) that are to receive
> maintenance or re-construction.  One 200 foot section
> of new road construction is planned to access a landing
> for units adjacent to private land (Prospect Farm).
> This short road segment would allow for a landing site

on National Forest Land.  These roads will be managed
during and after implementation of this project as they
currently are: closed with a gate or barrier to control
access.

Connected actions that are also authorized by this
decision include: timber stand improvement (100 acres
of regeneration release); 6 miles of aquatic and fish
habitat improvement; two short trail segment
relocations totaling 1250 feet; moving parking for Bog
Brook Trailhead from private land to Federal or Town
land; removal of a dilapidated structure; and
decommissioning and (as appropriate) obliterating eight
specific roads identified through Road Analysis as no
longer needed.

Than Project Decision Notice at 6-7.

Of particular concern to plaintiffs is the fact that a

portion of the Than Project involves activity within the Wild

River IRA, a roadless area encompassing approximately 71,000

acres.  See WMNF FEIS at 2-10, Table 2-01.  With regard to the

project's incursion into that roadless area, the Forest Service

made the following observations and conclusions:

The Forest Plan recognized the importance of unroaded
landscapes which provide older forest conditions and
large blocks of non-manipulated landscapes valued for
both ecological and social character.  These unroaded
landscapes make up 53% of the 800,000 acre White
Mountain National Forest.  The remaining 47 percent of
the Forest includes management emphasis that provides
for forestry activities, road systems for public
access, wildlife habitat projects, non-motorized
trails, Nordic and downhill ski trails, snowmobiling,
and a host of other activities.  Many of these

activities occur in areas allocated to the General
Forest Management Area (or MA 2.1).

The Than project area lies within this General Forest
Management Area 2.1 identified in the Forest Plan.  As
part of the Forest Planning effort, an inventory of
roadless characteristics was completed for the whole
Forest, to (1) inform the allocation process and (2)
help with Wilderness recommendations to Congress.
Approximately 55% of this Than project area fall[s]
into land that was inventoried as having "roadless"
characteristics during the Forest Plan, despite having
been actively managed for forest products over the last
40 years (EA, Chapter 3, Figure 13).

Than Project Decision Notice at 12.  In the end, the Forest
Service concluded that implementation of the Than Project would
"not significantly alter the character of the area or the
qualities which qualified it for inclusion in the inventory . . .
because the harvests are of limited intensity and minimal road
systems will be used. . . . The [Environmental Assessment]
demonstrates that actions proposed in Alternative 4 will not have
a lasting or significant effect on the roadless character of the
area."  Id.


IV.   The Batchelder Brook Vegetation Management Project.

Like the Than Project, the Batchelder Brook Project is a
site-level forest resource management project proposed for land
located entirely within Management Area 2.1, part of the roughly
one-half of the WMNF where activities such as timber management,

road systems for public access, developed recreational areas, ski
areas, and snowmobiling are emphasized.  A portion of the project
also falls within the boundaries of the South Carr Mountain IRA,
a roadless area that encompasses approximately 22,000 acres.  See
WMNF FEIS at 2-10, Table 2-01.  Accordingly, the Forest Service
recognized the need to consider the effects of the proposed
project on the roadless characteristics of that area.

The Batchelder Brook Environmental Assessment describes the
land subject to the project as follows:

> The project area consists of approximately 3,700 acres
> of National forest System Lands . . . . It has a
> history of agricultural use dating back to the early
> 1800s, and since the early 1900s has naturally reverted
> to forest land.  Since the 1940s it has been actively
> managed for wildlife habitat and forest products.  The
> most recent timber harvests in the project area were
> the Clifford Brook and Batchelder Brook timber sales in
> the 1990s.  Besides timber harvest, the area offers a
> wide variety of recreational activities, including
> hiking, scenic and fall foliage viewing, snowmobiling,
> mountain biking, snowshoeing, wildlife watching,
> hunting, fishing, and cutting Christmas trees and
> firewood.

Batchelder Brook Project Environmental Analysis, B.B. Vol. 3, Tab
1, page 1-2.  The project itself provides for the harvesting of 3
million board feet of timber from approximately 380 acres of
Management Area 2.1 land, including approximately 140 acres of
land that is also within the South Carr Mountain IRA.  See

generally Batchelder Brook EA at 1-7 through 1-10 (discussing the "proposed action," also known as "Alternative 2").

## Standard of Review

As noted above, plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), asserting that defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") and the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA").  Given the procedural posture of this case - that is, an appeal of an agency's administrative decision - there are no genuinely disputed material facts.  Consequently, the sole question presented is legal in nature: whether plaintiffs have carried their burden of proof and established that defendants' decisions to approve the Than and Batchelder Brook forest resource management projects were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable law." 5 U.S.C. § 706(2)(A).  See generally Utah Environmental Congress v. Russell, 518 F.3d 817, 823 (10th Cir. 2008) ("As neither the NFMA nor NEPA provide[s] a private right of action, we review the Forest Service's approval of the Project as a final agency action under the Administrative Procedure Act.").

With regard to judicial review of agency actions, the court of appeals for this circuit has observed that:

> the task of a court reviewing agency action under the [Administrative Procedure Act's] "arbitrary and capricious" standard, 5 U.S.C. § 706(2), is to determine whether the agency has <u>considered the relevant factors</u> and <u>articulated a rational connection</u> between the facts found and the choice made.  If the agency decision was based on a consideration of the relevant factors <u>and</u> there has not been a clear error of judgment, then the agency decision was not arbitrary or capricious.

<u>Dubois v. U.S. Dep't of Agric.</u>, 102 F.3d 1273, 1284-85 (1st Cir. 1996) (emphasis in original) (citations and internal punctuation omitted).  The "arbitrary and capricious" standard is, then, a highly deferential one, and the Forest Service's decisions are entitled to a "presumption of regularity."  <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).  <u>See also Baltimore Gas & Elec. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential."); <u>Adams v. United States EPA</u>, 38 F.3d 43, 49 (1st Cir. 1994) ("A court should not set aside agency actions as arbitrary and capricious unless the actions <u>lack a rational basis</u>.  The scope of review under the 'arbitrary and capricious' standard is therefore narrow, and a court should not substitute

14

its judgment for that of the agency.") (citations omitted)
(emphasis supplied).

## Discussion

In their amended complaint (document no. 15), plaintiffs
advance five distinct attacks on defendants' approval of the Than
and Batchelder Brook Projects, asserting that: (1) defendants
applied the wrong federal regulations in evaluating (and
ultimately approving) the projects; (2) defendants violated NEPA,
its implementing regulations, and the APA by failing to
adequately consider numerous potential adverse environmental
consequences of the projects; (3) defendants did not comply with
the Regional Soil Quality Standards, by failing to analyze the
soil from 13 units in the Than Project and from 21 units in the
Batchelder Brook Project; (4) defendants' Environmental
Assessments and Decision Notices were arbitrary and capricious,
an abuse of discretion, and not in accordance with governing law
because the Forest Service failed to prepare an Environmental
Impact Statement for either project; and (5) defendants violated
NEPA and its implementing regulations and otherwise acted
arbitrarily and capriciously by failing to make the Finding of No
Significant Impact Statement for either project available to the
public for 30 days.  Defendants deny each of those claims.

I.   <u>Statutory and Regulatory Framework</u>.

    A.   NEPA.

    The National Environmental Policy Act "declares a broad national commitment to protecting and promoting environmental quality," <u>Dubois</u>, 102 F.3d at 1285, and establishes two goals. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." <u>Baltimore Gas & Elec.</u>, 462 U.S. at 97 (citations and internal punctuation omitted). <u>See also</u> <u>Carcieri v. Kempthorne</u>, 497 F.3d 15, 46 (1st Cir. 2007).  But, as the Supreme Court has observed, when Congress enacted NEPA, it "did not require agencies to elevate environmental concerns over other appropriate considerations.  Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action." <u>Baltimore Gas & Elec.</u>, 462 U.S. at 97 (citation omitted).  It is the obligation of the courts "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." <u>Id</u>. at 97-98.

16

To meet its obligations under NEPA, the Forest Service must determine whether a proposed action will have a substantial environmental impact.  "In conducting this analysis, the Forest Service must prepare one of the following: (1) an environmental impact statement, (2) an environmental assessment, or (3) a categorical exclusion."  Utah Environmental Congress v. Bosworth, 443 F.3d 732, 736 (10th Cir. 2006) ("UEC III").  In this case, neither party asserts that the Than or Batchelder Brook project was eligible for a categorical exclusion.  Consequently, one of the questions presented is whether the Forest Service's preparation of environmental assessments for those projects was sufficient, or whether it should have gone further and prepared an environmental impact statement for one or both.

> An environmental impact statement involves the most rigorous analysis, and is required if a proposed action will "significantly affect the quality of the human environment."
>
> If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment.  An environmental assessment provides "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment.  If so, the agency must then develop an environmental impact statement; if not, the environmental assessment results in a "Finding of No Significant Impact," and no further agency action is required.

Id. (citations and footnote omitted).

17

B.   NFMA.

The National Forest Management Act provides that the
"Secretary of Agriculture shall develop, maintain, and, as
appropriate, revise land and resource management plans for units
of the National Forest System."  16 U.S.C. § 1604(a).  Those land
and resource management plans are commonly known as "forest
plans."

> The Forest Service manages each forest unit at two
> different levels: (1) programmatic and (2) project.
>
> At the programmatic level, the Forest Service creates
> general forest-wide planning goals memorialized in a
> forest plan.  Because the Forest Service must account
> for a variety of different interests, each forest plan
> envisions the forest will be used for multiple
> purposes, including "outdoor recreation, range, timber,
> watershed, wildlife and fish, and wilderness."  At the
> same time, the forest plan provides for "diversity of
> plant and animal communities based on the suitability
> and capability of the specific land area."
>
> At the project or site-specific level, the Forest
> Service implements the forest plan by approving or
> disapproving particular projects using an environmental
> impact statement, an environmental assessment, or a
> categorical exclusion.  Projects must comply with the
> applicable forest plan.

UEC III, 443 F.3d at 736-37 (citations omitted).

Here, as noted above, the Forest Service prepared an
environmental impact statement as part of the nine-year process
of revising the Forest Plan.  As to the two site-level projects

18

at issue in this case, however, the Forest Service began by
preparing environmental assessments (which incorporated the
research, analysis, and conclusions set forth in the recently-
completed forest-wide environmental impact statement).  And, when
each of those environmental assessments revealed that the subject
site-level project would have no significant impact on the
environment, the Forest Service issued a Finding of No
Significant Impact or "FONSI."

     C.   NFMA's Implementing Regulations.

The relevant NFMA implementing regulations have a complex,
if not convoluted, history, characterized by uncertainty as to
their precise meaning and application.  Further complicating
matters is the fact that a federal court has enjoined
implementation of the most recent iteration of those regulations.
See Citizens for Better Forestry v. U.S. Dep't of Agriculture,
481 F. Supp. 2d 1059 (N.D. Cal. 2007) (enjoining the Forest
Service from implementing or applying the 2005 regulations).  The
Court of Appeals for the Tenth Circuit has provided a detailed,
comprehensible, summary of that complex regulatory history in
Utah Environmental Congress v. Troyer, 479 F.3d 1269, 1272-74
(10th Cir. 2007).  In short, that history is as follows.

19

In 1979, pursuant to the requirements of NFMA, the United
States Department of Agriculture promulgated regulations that
"set out the process for the development and revision of land
management plans for units of the National Forest System, and
regulations that establish management planning standards and
guidelines." UEC III, 443 F.3d at 737 (quoting 47 Fed. Reg.
43,026, 43037 (Sept. 30, 1982)).  Those regulations governed the
Forest Service's management of national forests at both the
programmatic (i.e., forest plan) and project levels and they were
codified at 36 C.F.R. § 219 (the "1982 Rule").

In 2000, the USDA promulgated regulations to replace the
1982 Rule and which incorporated "significant new scientific
information and other lessons the agency ha[d] learned since it
began implementing NFMA planning regulations in 1982."  65 Fed.
Reg. 67515 (Nov. 20, 2000).  In connection with the promulgation
of the 2000 Rule, it was also observed that:

> Based on [] changes in the state of scientific and
> technical knowledge, the Forest Service's extensive
> experience, and a series of systematic reviews, the
> Forest Service has concluded that 36 C.F.R. part 219
> must be revised in order to better reflect current
> knowledge and practices and to better meet the
> conservation challenges of the future.  Indeed, while
> the 1982 planning rule was appropriate for developing
> the first round of [forest] plans from scratch, it is
> no longer well suited for implementing the NFMA or
> responding to the ecological, social, and economic

issues currently facing the national forests and
grasslands.

Id. at 67516.  Accordingly, a "key element in the [2000] rule is

greater emphasis on the use of science in planning.  The final

rule requires the use of the best available science to give the

Forest Service and the people, communities, and organizations

involved in the planning process sound information on which to

make recommendations about the resource conditions and outcomes

they desire.  The final rule incorporates science in the planning

and decisionmaking process in a number of ways."  Id. at 67518

(emphasis supplied).


To facilitate the transition from the 1982 Rule to the 2000

Rule, the new regulations contained a provision which allowed for

the continued use of the procedures set forth in the 1982 Rule

for Forest Plan revisions already in progress.  36 C.F.R. §

219.35.  With respect to the implementation of Forest Plans

during the transition period:

> responsible officials would be required to "consider
> the best available science in implementing and, if
> appropriate, amending" the then-existing forest plans
> (i.e., forest plans that had yet to be revised).  At
> the same time, however, § 219.35(d) also stated: "Site-
> specific decisions made by the responsible official 3
> years from November 9, 2000 and afterward must be in
> conformance with the provisions of this subpart."
> Thus, responsible officials were left to resolve the

> tension between § 219.35(a)'s mandate that they
> "consider the best available science in implementing"
> existing forest plans during the transition period, and
> § 219.35(d)'s provision that site-specific decisions
> did not have to conform to "this subpart," including,
> presumably, § 219.35(a), until November 9, 2003 and
> thereafter.

Utah Environmental Congress v. Troyer, 479 F.3d at 1273 (quoting

36 C.F.R. § 219.35).

In other words, there was some confusion as to whether,

under the 2000 Rule, new site-level projects (such as those at

issue here) still had to satisfy the requirements set forth in

the 1982 Rule, or whether they had to comply with the new "best

available science" standard of the 2000 Rule.  So, to address the

matter, the USDA issued an "Interpretive Rule" in 2004 to clarify

the purpose of the transition provision in the 2000 Rule.

> The Department is clarifying the intent of the
> transition provisions of paragraphs (a) and (b) of this
> section with regard to the consideration and use of the
> best available science to inform project decisionmaking
> that implements a land management plan as follows:
>
> Under the transition provisions of paragraph (a), the
> responsible official must consider the best available
> science in implementing and, if appropriate, in
> amending existing plans.  Paragraph (b) allows the
> responsible official to elect to prepare plan
> amendments and revisions using the provisions of the
> 1982 planning regulation until a new final planning
> rule is adopted.  A proposed rule to revise the
> November 9, 2000, planning regulations was published in

the Federal Register on December 6, 2002 (67 FR 72770).
A new final rule has not been promulgated.

Until a new final rule is promulgated, the transition
provisions of § 219.35 remain in effect.  <u>The 1982 rule
is not in effect</u>.  During the transition period,
responsible officials may use the provisions of the
1982 rule to prepare plan amendments and revisions.
<u>Projects implementing land management plans must comply
with the transition provisions of § 219.35</u>, but not any
other provisions of the 2000 planning rule.  <u>Projects
implementing land management plans</u> and plan amendments,
as appropriate, <u>must be developed considering the best
available science</u> in accordance with § 219.35(a).
Projects implementing land management plans must be
consistent with the provisions of the governing plan.

69 Fed. Reg. 58055, 58057 ("National Forest System Land and

Resource Management Planning; Use of Best Available Science in

Implementing Land Management Plans") (emphasis supplied).


        Finally, as noted above, in March of 2007, the Forest

Service was enjoined from implementing the 2005 Rule.  As a

consequence, the 2000 Rule continues to govern the amendment and

implementation (through site-level projects) of forest plans.


II.  <u>Regulations Applicable to the WMNF Site-Level Projects</u>.

        The Sierra Club asserts that the Forest Service erred by

failing to apply the 1982 regulations to the Than and Batchelder

Brook projects.  And, says the Sierra Club, the Forest Service

compounded its error by improperly applying the (enjoined) 2005

                                23

Rule and its requirement that the Forest Service consider the

"best available science," without reference to the Management

Indicator Species (the 1982 regulations employ, among other

things, the Management Indicator Species or "MIS" rather than the

"best available science" standard).


First, the Sierra Club asserts that "where a Forest Plan has

been adopted pursuant to a set of regulations, the projects

implementing that plan must also comply with those regulations."

Plaintiffs' Reply Memorandum (document no. 48) at 8.  But, the

fact that the Forest Plan was, after nine years of research and

planning, amended in 2005 pursuant to the 1982 regulations does

not compel the conclusion that the Forest Service is forever

bound to apply the 1982 regulations when evaluating site-level

projects under that Forest Plan.  Appellate decisions on this

point are clear.  The courts of appeals for both the Second and

Tenth Circuits have concluded that site-level projects

implemented during the "transition period" should be evaluated

under the 2000 Rule.

> The transition provisions mandate that "[d]uring the
> transition period, the responsible official <u>must</u>
> consider the best available science in <u>implementing</u>
> . . . the current plan."  36 C.F.R. § 219.35(a)
> (emphasis added); <u>cf</u>. § 219.35(b) ("If, as of November
> 9, 2000, a plan revision or amendment has been
> initiated under the 1982 planning regulations . . . the

responsible official <u>may</u> complete the amendment or
revision process under the 1982 regulations") (emphasis
added).  This language is the sole direction to the
Forest Service regarding project-level actions.
Nonetheless, it leaves little doubt that the Forest
Service is limited to consideration of the best
available science when approving a project during the
transition period.  The interpretative rule confirms
this interpretation, stating in no uncertain terms that
"projects <u>proposed</u> during the transition period should
be developed considering the best available science."
69 Fed.Reg. 58,055, 58,056 (Sept. 29, 2004) (emphasis
added).  While it is true that interpretative rules are
not legally binding on this court, an agency's
interpretation should be given substantial deference
unless the interpretation is plainly erroneous.  Here,
the interpretative rule clearly concludes the 1982
rules are no longer applicable for projects proposed
during the transition period.  Thus, any projects
proposed during the transition period must conform with
the best available science standard set forth in the
2000 transition provisions.

<u>UEC III</u>, 443 F.3d at 746-47 (emphasis in original).  <u>See also</u>

<u>Forest Watch v. U.S. Forest Service</u>, 410 F.3d 115, 118 (2d Cir.

2005).


The cases cited by plaintiffs do not compel a different

conclusion.  Those cases stand for the logical proposition that

if a forest plan specifically adopts the requirements of the 1982

regulations as part of the forest plan itself, subsequent

implementation of site-level projects must adhere to those

regulations — not because they are applicable as "regulations,"

but because, as noted above, all site-level projects must comply

with the provisions of the forest plan, and incorporated regulations become part of the plan.  See, e.g., Ecology Center, Inc. v. U.S. Forest Service, 451 F.3d 1183, 1190 (10th Cir. 2006) ("Forest plans may require particular standards to be followed regardless of later changes in the regulations.  But this is not the case here.  The Forest Plan 'does not explicitly reference or adopt § 219.19 of the 1982 rules, concerning the selection and monitoring of management indicator species.  Therefore, we cannot read the Forest Plan to adopt the 1982 rules.") (citation omitted); Idaho Wildlife Federation v. Tower, 2006 WL 988494 (D. Idaho April 13, 2006) (concluding that because the forest plan adopted a particular species of bird as a Management Indicator Species - a concept not present in the 2000 Rule - the Forest Service was obliged to comply with the 1982 regulations).  In this case, however, plaintiffs do not assert that the Forest Plan specifically incorporated provisions of the 1982 regulations.

Second, contrary to plaintiffs' suggestion, the record reveals that the Forest Service properly applied the 2000 transition rules (and the requirement that the Forest Service apply the "best available science") to the Than and Batchelder Brook projects.  In support of their assertion that the Forest Service improperly employed the (enjoined) 2005 Rule, plaintiffs

point to a single reference in the Environmental Assessment
prepared for the Than Project - a document consisting of more
than 200 pages.   See Than EA, Than Vol. 3, Tab 6, page 3-81.   The
Forest Service explains that single reference as follows:

> A Public Comment Package for the Than Project was
> distributed in January 2006, initiating the public
> process for the project.  An EA [Environmental
> Assessment] was finalized and a DN [decision notice]
> signed in May 2006.  In August 2006, the original DN
> was withdrawn for narrow reasons.  A revised EA was
> sent to the public for comment in November 2006.  On
> March 30, 2007, just before the revised EA was
> finalized and the DN issued, the 2005 Rules were struck
> down.  Given the decision, the Forest Service reviewed
> the EA to remove any references to the invalidated
> regulations and modify the analysis.  Unfortunately,
> one citation was missed.  That is hardly persuasive
> evidence that the decision was based on the wrong
> analytical framework.

Defendants' Memorandum (document no. 45-2) at 15 (citations
omitted and emphasis supplied).  The court agrees.  A single,
stray reference to the 2005 Rule (which the Forest Service
asserts was a typographical error) does not demonstrate that the
Forest Service employed the wrong regulations and applied the
wrong standard in assessing the environmental impact of either
the Than or Batchelder Brook project, nor does it reveal that the
Forest Service failed to properly analyze those projects under
the 2000 Rule.

Moreover, as the Forest Service points out, the Sierra Club has not shown how the Forest Service failed to consider the "best available science," as was required by the 2000 Rule.  To be sure, the Sierra Club claims that the Forest Service's failure to consider the best available science is evidenced by its alleged refusal to "consider its own comprehensive study that acknowledges that there is no need at the landscape level to create more early-successional, regeneration-age class across the forest."  Plaintiffs' Reply Memorandum at 14.  The study referenced by the Sierra Club is the "Assessment of Terrestrial Biodiversity in the White Mountain National Forest Region," prepared by Dr. Michael L. Cline, et al. (December, 1999) (separately bound exhibit).  But, contrary to plaintiffs' suggestion, the record discloses that the Forest Service <u>did</u> consider the Cline report and, in fact, submitted it for peer review.  <u>See, e.g.</u>, B.B. Vol. 11, Tabs 25 and 26.

In summarizing the peer review comments it received on the Cline report, the Forest Service observed that "most reviewers expressed concern with some of the methods used by Cline et al. to analyze data or with the representation of information and conclusions drawn in the document.  Several indicated that the Forest Service needed to gather additional literature and data

and then re-analyze the resulting complete set of information to have the best available science in our Forest Plan revision effort." Development and Use of the Terrestrial Assessment in Forest Plan Revision, B.B. Vol. 11, Tab 24. The Forest Service went on to explain that the Cline report "was not cited in the main body of the Final Environmental Impact Statement (FEIS) for the Forest Plan revision effort because it was not a primary source of new data. Interdisciplinary team members used it, and the peer review letters, to identify sources of information that were then reviewed independently by team members. It is included in the listing of literature cited in the FEIS because it was cited in a response to a comment from the public." Id. Rather than supporting plaintiffs' assertion that the Forest Service "failed to identify and actually consider its own understanding of the 'best available science,'" Plaintiffs' Reply Memorandum at 14, the manner in which the Forest Service employed the Cline report (and the peer review letters) suggests that it did use the best available science in reviewing the Batchelder Brook project. At a minimum, the Sierra Club has not shown that the manner in which the Forest Service considered the Cline report was arbitrary and capricious or that it amounted to an abuse of discretion.

29

The record is entirely consistent with the Forest Service's explanation of its use of the 2000 Rule: when application of the 2005 Rule was enjoined, the Forest Service attempted to remove all references to that rule and reviewed the projects to make certain that they had been properly evaluated under the 2000 Rule's "best available science" standard.[3]  <u>See</u> Defendants' Reply Memorandum (document no. 49) at 8-9 ("As a practical matter, after the 2005 regulations were enjoined the Forest Service reviewed the EA to confirm that it considered the best available science.  Since the EA conformed to the Forest [Service's] practice of considering the best available science, there was no need for specific changes to the EA other than to remove references to the 2005 regulations.  <u>See, e.g.</u>, Than Vol. 17 Tabs 6-12; <u>see also</u> Than DN at 26, Than Vol. 2, Tab 5 at 5-7, 26-30 (Biological Evaluation), Vol. 16, Tab 15 at 26-27, Than EA at 3-102 - 105.").  Plaintiffs have, then, failed to demonstrate that the Forest Service was arbitrary and capricious in its application of the 2000 Rule, nor have they shown that the Forest Service applied the wrong rule.

---

[3]     Parenthetically, the court notes that both the 2000 transition rules and the (enjoined) 2005 Rule mandate the use of "best available science."

III. <u>Wilderness Potential and Roadless Character and Values</u>.

Next, plaintiffs assert that the Environmental Assessments prepared for both the Than and Batchelder Brook projects "fail to adequately assess how the proposed logging, clear-cutting, skid trails, and soil disturbance would affect the wilderness characteristics and values of these roadless areas." Plaintiffs' memorandum at 20. The Forest Service responds that it gave through and extensive consideration to the wilderness characteristics of the subject lands as part of the multi-year process of revising the Forest Plan. As a part of that process, the Forest Service conducted an inventory of all land within the WMNF to determine which areas met the criteria as potential Wilderness Areas.

> As a result of the forest-wide inventory, 27 roadless
> areas were identified totaling 403,144 acres. Despite
> nearly 20 years of management (including timber
> harvest) under the then-existing Forest Plan, this was
> an additional 160,000 acres beyond the roadless areas
> identified for the 1986 [Forest] Plan. . . . Based on
> public input and various criteria, the Forest [Service]
> evaluated which, if any, of these areas should be
> recommended to Congress for study as Wilderness. This
> was a substantial undertaking. The Regional Forester
> ultimately recommended 34,500 acres for designation.
> This recommendation was accepted by Congress, so that
> now approximately 18% of the Forest is managed as
> Wilderness. Areas not included in recommendation for
> Wilderness study were allocated to the other 14 MAs
> [Management Areas].

Defendants' memorandum at 18-19 (citations omitted).  The Forest

Service concludes by asserting:

> Plaintiffs argue that NFMA compels the reconsideration
> at the project level because the decision "will
> irretrievably commit these areas to nonwilderness uses
> for the long term," and impacts are to be considered
> before actions are taken.  Plaintiffs' assumption that
> these project areas are irretrievably committed to non-
> wilderness is belied, however, by the record and recent
> Congressional action.  This position also gives short
> shrift to the recent Forest-wide analysis of land
> allocations in the FEIS for the Forest Plan, and the
> balancing done to designate the lands at issue for uses
> compatible with vegetation management.  The Forest
> Service is entitled to rely on those allocations and
> need not reconsider them every time a site-specific
> decision is made.  A holding to the contrary would
> eviscerate the very purpose of a forest plan, and
> burden the Forest Service with the sisyphean feat of
> forever starting over in its environmental evaluations,
> regardless of the usefulness of such efforts.

Id. at 19-20 (citations and internal punctuation omitted).  In

other words, the Forest Service contends that, as part of the

recent revision of the Forest Plan (which included the

preparation of a comprehensive Environmental Impact Statement),

it gave substantial consideration to the wilderness

characteristics of all the land within the WMNF, including the

land within the Than and Batchelder Brook projects.  And, says

the Forest Service, there is no legal, regulatory, or practical,

common sense reason to force it to repeat that effort.

In support of their position, plaintiffs rely upon the
opinion issued by the Ninth Circuit Court of Appeals in
California v. Block, 690 F.2d 753 (9th Cir. 1982).  Specifically,
plaintiffs quote Block for the proposition that "the 'critical
decision' to commit [roadless] areas for nonwilderness uses, at
least for the next ten to fifteen years, is 'irreversible and
irretrievable.'  The site-specific impact of this decisive
allocative decision must therefore be carefully scrutinized now
and not when specific development proposals are made."  Block,
690 F.2d at 763 (emphasis supplied).  See also Plaintiffs'
memorandum at 16; Plaintiffs' Reply Memorandum (document no. 48)
at 18-23.  Importantly, however, as the highlighted language
above suggests, the situation presented in Block was decidedly
different from that presented in this case.

In Block, the court addressed a challenge to the Forest
Service's nation-wide effort to "evaluate programmatically the
roadless areas in the [entire] National Forest System."  Id. at
758.  As part of that project (known as "RARE II"), the Forest
Service inventoried all roadless areas within the National Forest
System (approximately 62 million acres) and assigned each to one
of three planning categories: Wilderness, Further Planning, and
Nonwilderness.  The plaintiffs in Block challenged the RARE II

33

final environmental impact statement as it related to the proposed designation of roadless areas as Nonwilderness, asserting that the FEIS failed to adequately examine the site-specific impact of the proposed action.  The court of appeals agreed, concluding that the FEIS failed to adequately assess the wilderness values of each area and neglected to evaluate the impact of Nonwilderness designations upon each area's wilderness characteristics and value.  Id. at 764.  Plaintiffs focus on that aspect of the court's holding and urge this court to impose the same requirement on the Forest Service in this case.  That is, plaintiffs assert that the Forest Service failed to adequately consider the wilderness characteristics and values of the Than and Batchelder Brook sites prior to authorizing forest management (including timber cutting) activities within them.  The court disagrees.

As the Forest Service points out, Block addressed the requirements of an FEIS in the context of a situation in which areas within the National Forest System were being designated into one of three general management categories.  Precisely that type of categorization (although on a smaller, and more refined, scale) was undertaken in this case as part of the preparation of the 2005 amendments to the Forest Plan.  That is, as part of the

34

process of revising the Forest Plan, the Forest Service inventoried all land within the WMNF, evaluated its characteristics, prepared an FEIS, and, ultimately, placed all land within the forest (other than that recommended for Wilderness designation) into one of 14 Management Areas.  And, as noted above, the Forest Plan placed the land encompassing the Than and Batchelder Brook projects into MA 2.1 or "General Forest Management."  That plan was not challenged.  Consequently, the analysis plaintiffs seek (and the analysis mandated by <u>Block</u>) has already been performed and disclosed in the FEIS.  <u>See generally</u> Defendants' Reply Memorandum at 9-17.  And, importantly, neither the 2005 Forest Plan nor the FEIS is the subject of plaintiffs' complaint, since the time for such challenges has lapsed.

Seemingly recognizing that problem, plaintiffs attempt to impose upon the environmental assessments prepared in connection with the Than and Batchelder Brook site-level projects the requirements applicable to <u>Forest Plan</u> environmental impact statements, as suggested in <u>Block</u> (and later incorporated into the Forest Service Handbook).  <u>See</u> Plaintiffs' memorandum at 17. Plaintiffs have not, however, pointed to any legal authority, or persuasive reasons, for imposing such redundant requirements.  If plaintiffs thought the WMNF FEIS failed to include the type of

analysis required by both <u>Block</u> and the Forest Service Handbook
when the land encompassing the Than and Batchelder Brooks
projects was submitted to the General Forest Management category,
they could have brought a timely challenge to the 2005 Forest
Plan and its FEIS.

To the extent the Sierra Club asserts that the environmental
assessments prepared in connection with the Than and Batchelder
Brook projects fail to adequately address the impacts of those
projects on the character and values of unroaded areas, the
administrative record belies that claim.  Both the Than EA and
the Batchelder Brook EA reveal that the Forest Service took the
required "hard look" at the effects of the proposed projects on
the unroaded characteristics of the areas.  <u>See</u> Than EA, Than
Vol. 3, Tab 5, pages 3-107 through 3-117; Batchelder Brook EA,
B.B. Vol. 3, Tab 1, pages 3-93 through 3-103 (noting that the
effects of the project "would not result in an irreversible or
irretrievable change in the condition of the land or its
eligibility as potential wilderness.").  <u>See generally</u> <u>Kleppe v.
Sierra Club</u>, 427 U.S. 390, 410 n.21 (1976) ("Neither [NEPA] nor
its legislative history contemplates that a court should
substitute its judgment for that of the agency as to the
environmental consequences of its actions.  The only role for a

court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken.")(citations and internal punctuation omitted).

IV.   <u>Soil and Water Resources</u>.

Next, plaintiffs challenge the Forest Service's alleged failure to properly employ the Regional Soil Quality Standard ("RSQS") to evaluate the potential effects of the Than and Batchelder Brook projects on soil quality and erosion.   <u>See generally</u> Forest Service Handbook Eastern Region, FSH 2509.18 – Soil Management, Chapter 2 – Soil Quality Monitoring, Than Vol. 7, Tab 13.   Specifically, plaintiffs assert that:

> Soil and water quality degradation issues are very sensitive to each site's conditions, and effects may be felt from disturbance in even small areas.   The agency's <u>failure to use RSQS for site-specific analysis</u> and provide an <u>analysis for each harvest unit</u> results in an incomplete examination.   The Forest Service violated NFMA by not applying the RSQS to the projects and acted arbitrarily and capriciously in violation of the APA.

Plaintiffs' Reply Memorandum at 31 (emphasis supplied).   <u>See also</u> Plaintiffs' Memorandum at 21 (alleging that the Forest Service "never analyzed thirteen [harvest] units in the Than project area

and never analyzed twenty-one units in the Batchelder project area").

The NFMA charges the Secretary of Agriculture and, through him, the Forest Service, with ensuring that "timber will be harvested from National Forest System lands only where soil, slope, or other watershed conditions will not be irreversibly damaged." 16 U.S.C. § 1604(g)(3)(E). And, as noted above, any site-level projects (like those at issue here) must comply with the provisions of the Forest Plan. For its part, the RSQS provides that, unless the Forest Plan directs otherwise, the Forest Service should not allow activity within a land unit if it would create "detrimental" soil conditions (specifically defined in the RSQS) in fifteen percent or more of the activity area. RSQS, Than Vol. 7, Tab 13, page 6 ("Adhere to soil quality standards identified in land management plan direction. Lacking a more specific forest direction, use 15%, or more, of a land unit scale area in detrimental soil condition as a standard for potentially detrimental soil disturbance.").

There is no doubt that the Forest Service conducted soil analyses of the land within the WMNF as part of the process of revising the Forest Plan. Nor is there any dispute that the

38

Forest Service conducted soil analyses within areas covered by both the Than and Batchelder Brook Projects as part of the process of approving those projects.  Plaintiffs' point, however, is that the Forest Service was required to do more.  That is, plaintiffs assert that the Forest Service was obliged to employ the RSQS and analyze the potential soil impact of the proposed projects on each individual harvest unit within those project areas.  The Forest Service's use of a "sampling method" to evaluate the potential impact of the projects on soil quality, say plaintiffs, was insufficient.

The Forest Service advances three arguments in response. First, it says the RSQS (which is a part of the Forest Service Handbook) is an internal agency guideline which is not binding on the Forest Service and is not enforceable by third parties.  At least two courts of appeals to address the issue have agreed. The Court of Appeals for the Ninth Circuit wrote that:

> Neither the Manual nor the Handbook satisfies either of
> the requirements in Fifty-Three Parrots [685 F.2d 1131
> (9th Cir. 1982)].  First, the Manual and Handbook are
> not substantive in nature.  [Previously], we explained
> in dictum that the Forest Service Manual merely
> establishes guidelines for the exercise of the
> Service's prosecutorial discretion; it does not act as
> a binding limitation on the Service's authority.  The
> Manual and Handbook are a series of "[p]rocedures for
> the conduct of Forest Service activities."  36 C.F.R. §
> 200.4(b), (c)(1) (1995).

> The Manual and Handbook are not promulgated in
> accordance with the procedural requirements of the
> Administrative Procedure Act.  Neither is published in
> the Federal Register or the Code of Federal
> Regulations.  They are not subjected to notice and
> comment rulemaking; they are not regulations.
>
> Nor are the Manual and Handbook promulgated pursuant to
> an independent congressional authority.  The National
> Forest Management Act authorizes the Secretary to
> promulgate regulations, but the Manual and the Handbook
> are not regulations from the Secretary.  36 C.F.R. §
> 200.4(d)(1) (1995) (Chief of Forest Service promulgates
> rules in Manual and Handbook).  The Manual and Handbook
> provisions are contemplated in a Service regulation,
> not in a congressional statute.
>
> We hold that the Manual and Handbook do not have the
> independent force and effect of law.

Western Radio Services Co. v. Espy, 79 F.3d 896, 901 (9th Cir.

1996) (citations and internal punctuation omitted).  See also

Stone Forest Indus. v. United States, 973 F.2d 1548, 1551 (Fed.

Cir. 1992) (holding that the Forest Service Handbook is "a

general guide for use by Forest Service employees," which "does

not have the force and effect of law").


     Thus, says the Forest Service, it was obligated to analyze

the proposed site-level projects to make certain that they were

consistent with the requirements of the Forest Plan, not the RSQS

guidelines described in the Forest Service Handbook.  And, the

Forest Service goes on to point out that the Than and Batchelder

Brook Environmental Assessments demonstrate that both projects

meet all the requirements of such site-level projects, as established in the Forest Plan.  <u>See generally</u> Than EA, Than Vol. 3, Tab 6, pages 3-19 through 3-34; Batchelder Brook EA, B.B. Vol. 3, Tab 1, pages 3-6 through 3-20.  <u>See also</u> Defendants' Reply Memorandum at 19-20.

Next, the Forest Service says that, contrary to plaintiffs' suggestion, there is no statutory or regulatory requirement "to use a particular sampling methodology or visit 100 percent of the units within a timber harvest area."  Defendants' Memorandum at 26.  Accordingly, says the Forest Service, "the Agency expert appropriately observed field conditions, reviewed applicable scientific literature, and employed a reasonable sampling methodology to evaluate soil conditions, assess potential effects, and verify mitigation efficacy."  <u>Id</u>.  <u>See generally</u> <u>Siskiyou Regional Edu. Project v. Goodman</u>, 219 Fed. Appx. 692, 698 (9th Cir. 2007) (distinguishing the cases of <u>Lands Council v. Powell</u>, 379 F.3d 738 (9th Cir. 2004), <u>amended by</u> 395 F.3d 1019 (9th Cir. 2005), and <u>Ecology Center v. Austin</u>, 430 F.3d 1057 (9th Cir. 2005) - two opinions on which plaintiffs in this case rely heavily - noting that "the record shows that the Forest Service based its soil analysis on actual field surveys, not on some model with no on-site inspection or verification").

Finally, the Forest Service asserts that, even though it was
not required to apply the RSQS in evaluating the potential impact
the projects would have on soil erosion and compaction, its
analysis of those projects revealed that the total soil disturbed
by the proposed projects would likely be well within the limits
prescribed by the RSQS.  See Than EA, Than Vol. 3, Tab 6, page 3-
28; Batchelder Brook EA, B.B. Vol. 3, Tab 1, page 3-14.

As to plaintiffs' claims concerning the Regional Soil
Quality Standard set forth in the Forest Service Handbook, the
court declines the invitation to hold that the Forest Service was
obligated to subject each harvest unit to the soil quality
analysis established in the RSQS.  First, neither the Forest
Service Handbook nor the RSQS has the "independent force and
effect of law."  Western Radio Services, 79 F.3d at 901.  See
also Stone Forest Indus, 973 F.2d at 1551.  The RSQS is, then,
aspirational rather than mandatory.  See, e.g., RSQS, Than Vol.
7, Tab 13, page 3, § 2.04b(1) (directing forest supervisors to
"consider, and incorporate when appropriate, regional soil
quality standards into the Forest Plan [and] [d]evelop and
implement forest-level soil quality standards when needed.").

Additionally, the situation presented in this case is factually distinct from those in Ecology Center and Lands Council - the two cases upon which plaintiffs most heavily rely for the proposition that the Forest Service was obligated to employ the RSQS and conduct soil testing within each affected harvest unit. In Ecology Center, despite having previously held that neither the Forest Service Manual nor the Handbook was binding on the Forest Service, see Western Radio Services, supra, the Court of Appeals for the Ninth Circuit concluded that, under the specific circumstances presented, the Forest Service was, nevertheless, obligated to employ the RSQS.

> Even assuming, arguendo, that the Standard does not
> have the independent force and effect of law with
> respect to the Lolo National Forest, it would
> nonetheless be arbitrary and capricious for the Forest
> Service to ignore it because both the draft EIS and
> final EIS discuss the Standard as if it is binding and
> claim that the Service developed the Project in
> compliance with its provisions.  Thus, even if we were
> to agree that the Standard is merely advisory, we would
> then be compelled to find that the draft EIS and final
> EIS are misleading in violation of NEPA.

Ecology Center, 430 F.3d at 1069 (emphasis supplied). Accordingly, the court held that by approving the challenged project without employing the RSQS, the Forest Service violated both NEPA (i.e., failed to give a "hard look" at the effects of the project on soil quality) and NFMA and the APA (i.e., acted

43

arbitrarily and capriciously in approving the project without adequate soil quality analysis).

In holding that the Forest Service violated NFMA when it authorized challenged timber harvest activity in the Idaho Panhandle National Forest, the court in Lands Council observed that, in addition to the provisions of RSQS, the forest plan itself prohibited any activity that would create detrimental soil conditions in fifteen percent or more of the project area.  395 F.3d at 1034.  Additionally, the court noted that the "Forest Service did not walk, much less test, the land in the activity area."  Id.  Here, however, the Forest Service did conduct such field testing in the project areas.

The facts presented in this case are plainly (and materially) different from those presented in both Ecology Center and Lands Council.  First, the Sierra Club has not identified any provisions in the Forest Plan that require use of the RSQS when reviewing proposed site-level projects.  Nor has the Sierra Club pointed to any instances in which either the Than EA or Batchelder Brook EA suggests that the project has been reviewed in compliance with the RSQS.  Rather than suggest that any analysis has been conducted in accordance with the RSQS, the Than

44

and Batchelder Brook EAs simply predict that, given the research
and analysis actually performed, the adverse effects on soil
conditions as a result of the projects will likely be within the
tolerances allowed by the RSQS.  See Than EA, Than Vol. 3, Tab 1,
page 3-28 (predicting that the "cumulative effects from soil
erosion and compaction . . . are likely to be site specific,
limited in magnitude and duration, and well within the soil
disturbance limits established by the Soil Quality Standards for
the Eastern Region of the Forest Service") (emphasis supplied);
Batchelder Brook EA, B.B. Vol. 3, Tab 1, page 3-14 (same).

    For the reasons discussed above, the court concludes that
the Forest Service was not required to employ the RSQS to conduct
soil erosion and compaction analysis at the harvest unit level
prior to approving the Than and Batchelder Brook projects.  And,
the Sierra Club has failed to demonstrate that, in light of the
soil analysis actually performed, the Forest Service's approval
of those projects was arbitrary or capricious.  Nor has the
Sierra Club shown that the Forest Service failed to take the
required "hard look" at the impact those projects would have on
soil conditions in the affected areas.  As the Supreme Court has
observed, in cases like this, which involve highly scientific
and/or technical issues, "[r]esolving these issues requires a

45

high level of technical expertise [which] is properly left to the informed discretion of the responsible federal agencies.  Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976) (citation omitted).

V.   Environmental Impact Statement.

Next, the Sierra Club asserts that, prior to approving the Than and Batchelder Brook projects, the Forest Service should have prepared comprehensive environmental impact statements, rather than simply the environmental assessments that were actually used.  Specifically, plaintiffs claim that the "decision to harvest timber from an [inventoried roadless area] requires a site-specific and intensive level of scrutiny that the Than and Batchelder Environmental Assessments ("EAs") simply did not undertake."  Plaintiffs' Reply Memorandum at 28.  They go on to assert that, "[g]iven the strong public interest in protecting potential wilderness areas, it is essential that, before logging and road building activities occur, the agency analyze the effects in an Environmental Impact Statement and disclose to the public the impacts of the Projects." Id.  See also Plaintiffs' Memorandum at 23.

As noted above, NEPA requires federal agencies to consider the potential environmental impacts of agency decisions.  As to any agency action that could significantly affect the quality of the human environment, the agency must prepare a comprehensive environmental impact statement.  But, to determine whether an environmental impact statement is necessary - that is, if the project will likely have a substantial impact on the human environment - agencies often begin by preparing an environmental assessment.  If, based on the environmental assessment, the agency determines that an environmental impact statement is not necessary, it issues a "Finding of No Significant Impact" or "FONSI."  <u>See</u> <u>Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Admin.</u>, 463 F.3d 50, 57 n.2 (1st Cir. 2006).  Here, as was the case in <u>Back Bay</u>, the agency "prepared an EA and a FONSI.  The FONSI found that the proposed project will have no significant adverse impacts on the environment, and thus that an EIS was not required."  <u>Id</u>. (citation and internal punctuation omitted).

To prevail on their claim that the Forest Service acted arbitrarily and capriciously by failing to prepare an EIS for the Than and Batchelder Brook projects, plaintiffs must do more than simply identify potential shortcomings in the projects themselves

or their environmental assessments/decision notices.  As the
Court of Appeals for the Fifth Circuit has observed, "in
attacking a decision not to prepare an EIS, more than an
allegation of deficiencies is necessary; the plaintiffs must
prove the essential allegations of their complaint by a
preponderance of the evidence.  It is the burden of the
plaintiffs to adduce evidence, not merely to make allegations or
to rest on assumptions, establishing that the [agency] was
arbitrary and capricious in reaching the conclusion it did."
Coliseum Square Ass'n v. Jackson, 465 F.3d 215, 231-32 (5th Cir.
2006) (citations and internal punctuation omitted).  See also
Advocates for Transportation Alternatives, Inc. v. U.S. Army
Corps of Engineers, 453 F. Supp. 2d 289, 299 (D. Mass. 2006)
("Review of an agency's determination to adopt a FONSI instead of
preparing an EIS is governed by the arbitrary and capricious
standard.  This standard requires the plaintiff to show a
substantial possibility that agency action could significantly
affect the quality of the human environment.") (emphasis
supplied) (citations and internal punctuation omitted).
Plaintiffs have failed to carry that burden.

    In concluding that the Than project would "not have a
significant effect on the quality of the human environment," Than

48

Project Decision Notice at 20, the Forest Service addressed both the context and intensity of the effects of the proposed project, as is required by the governing regulations.  See 40 C.F.R. § 1508.27.  With regard to the intensity of the project's likely effects, the Forest Service considered ten separate factors, see id. at § 1508.27(b), and, as to the project's effect on the "unique characteristics of the geographic area," the Forest Service concluded:

> There will be no significant effect to unique characteristics of the area, or to prime farmland, or heritage resources within the project area.  There are no ecologically critical areas, such as wetlands, wild scenic rivers, adjacent parklands, or Wilderness within the project area.  Based on the EA ("Wilderness and Roadless" chapter 1), I have determined there will be no significant effects to the roadless or wilderness character of an Inventoried Roadless Area, nor will any of the proposed activities affect the availability of the Wild River Inventoried Roadless Area for inclusion in future roadless inventories.
>
> The effects analysis contained in the EA clearly demonstrates that changes in forest cover will be detectable only within the project area boundary or from a limited number of vantage points in the immediate surrounding area (p. 3-15 to 3-17).  Furthermore, these changes will be of a temporary nature, and not on a scale that forecloses the area from roadless or wilderness consideration now or in the future.  There will be minimal permanent change to the landscape from new road construction (200 feet) or trail construction (1250 feet relocation).  All proposed activities are well within allowable limits for Eastern Wilderness.  Less than one percent of the Wild River IRA will be harvested in this entry as a result of Than.  Even when this project is combined with all the past, present, and reasonably foreseeable

> <u>harvest in the area, it comes to less than 3% of the</u>
> <u>total Wild River IRA – nowhere near the 20% allowed</u>.
> All of the planned activities combined do not directly,
> indirectly or cumulatively add up to a significant
> effect to the Wild River IRA.  The effects of this
> project are even less significant when considered at
> the Forest level where, after decades of active
> management, we still record "27 Roadless Areas totaling
> over 403,000 acres Forestwide" (EA page 3-88).
> Clearly, active management on the Forest has not
> adversely affected its generally primitive "roadless"
> character.  The Than project is a relatively minor
> local entry into an inventoried roadless area, and not
> significant enough to require an EIS or set a National
> precedent.

Than Project Decision Notice, "Finding of No Significant Impact,"

Than Vol. 3, Tab 5, pages 21-22 (emphasis supplied).  The Forest

Service made similar findings with respect to the effects of the

Batchelder Brook project.  <u>See</u> Batchelder Brook Project Decision

Notice, B.B. Vol. 3, Tab 2, pages 7-8 and 20-23.


     Plaintiffs assert two arguments in support of their view

that the Forest Service should have prepared a site-specific

environmental impact statement for each project.  First, they

voice the reasonable and logical view that, prior to engaging in

any type of forest management activities in roadless (and

potential wilderness) areas, the Forest Service should give

careful consideration to the possible effects of such activities.

Plaintiffs' Reply Memorandum at 28.  In fact, that view is also

embraced by governing federal laws and their implementing

regulations.  Plainly, however, more than simply echoing
applicable statutory and regulatory requirements is necessary to
demonstrate that the Forest Service's conclusions, based upon the
EA's (which incorporated the recent Forest EIS), were arbitrary
and capricious.  See generally Coliseum Square, 465 F.3d at 231-
32.


     Next, plaintiffs suggest that every incursion into a
roadless area that involves timber management activities
necessarily affects the human environment in a significant way
because the decision to engage in such activity is "irreversible
and irretrievable."  Plaintiffs' Reply Memorandum at 29-30
(quoting Block, 690 F.2d at 763).  Consequently, say plaintiffs,
whenever site-level projects involve intrusion into a roadless
area, the Forest Service is compelled to prepare an EIS.  See
Id.; see also Plaintiffs' Memorandum at 22-23.  But, as the Court
of Appeals for the Ninth Circuit has held on at least two
occasions (once expressly, and once implicitly), an EIS is not
automatically required every time the Forest Service proposes
timber management activities in a roadless area.

          The parties have expended considerable effort arguing
          about whether the agency must prepare a site-specific
          EIS.  In National Audubon [Soc'y v. U.S. Forest
          Service, 4 F.3d 832 (9th Cir. 1993], we remanded for
          consideration of whether the agency's decision not to

> prepare an EIS in connection with a timber sale on
> inventoried land was arbitrary and capricious.
> National Audubon, 4 F.3d at 837-41.  Implicit in that
> remand was our conclusion that an EIS may not be per se
> required under such circumstances.  We leave to the
> agency the decision of how best to comply with NEPA and
> its implementing regulations, and hold only that the
> NEPA documents before us are insufficient.

Smith v. U.S. Forest Service, 33 F.3d 1072, 1079 (9th Cir. 1994).


In light of the foregoing, the court concludes that the

Sierra Club has not met its burden of demonstrating that the

Forest Service acted arbitrarily and capriciously or abused its

discretion when it concluded that neither the Than nor Batchelder

Brook project would have a significant effect on the quality of

the human environment.  Accordingly, plaintiffs have not shown

that the Forest Service acted arbitrarily or capriciously when it

determined that neither project required the preparation of an

environmental impact statement.


VI.   Finding of No Significant Impact.

Finally, plaintiffs assert that the Forest Service violated

the provisions of NEPA by failing to make either of the FONSIs

available for public comment for 30 days prior to issuing the

decision notices.  Generally speaking, a federal agency is not

required to circulate a draft FONSI for public comment prior to

issuing a Notice of Decision.  See, e.g., Alliance to Protect
Nantucket Sound, Inc. v. U.S. Army Corps of Engineers, 398 F.3d
105, 115 (1st Cir. 2005).  There are, however, exceptions to that
general principle.  Here, plaintiffs invoke the exception
established in 40 C.F.R. § 1501.4(e)(2)(i), which provides that
an agency shall make the FONSI available to the public when the
"proposed action is, or is closely similar to, one which normally
requires the preparation of an environmental impact statement."
And, say plaintiffs, because "decisions to log in an IRA normally
require preparation of an EIS," Plaintiffs' Memorandum at 24, the
Forest Service should have made the Than and Batchelder Brook
FONSIs available for public comment.

    In support of their assertion that the projects at issue in
this case are "closely similar" to projects typically requiring
the preparation of an EIS, plaintiffs point to the Forest Service
Handbook, FSH 1909.15, Chapter 20.6 ("Environmental Impact
Statements and Related Documents"), which provides:

    Classes of actions that require preparation of
    environmental impact statements are listed below.

    The requirements for classes 2, 3, and 4 may be met by
    the appropriate use of program environmental impact
    statements and tiered site-specific environmental
    documents or by the preparation of site-specific
    environmental impact statements.

* * *

**Class 3**:  Proposals that would substantially alter the
undeveloped character of an inventoried roadless area
of 5,000 acres or more (FSH 1909.12).

FSH 1909.15, Ch. 20.6 (emphasis supplied).  As the highlighted
language makes clear, even projects that are far larger than the
Than and Batchelder Brook projects and that would "substantially
alter" the undeveloped character of an inventoried roadless area
do not necessarily require the preparation of an EIS.  Instead,
even with projects of significantly greater size and
environmental impact, the Forest Service can meet its statutory
and regulatory obligations by preparing site-level environmental
assessments that are tiered to the forest-level EIS.  See, e.g.,
Smith, 33 F.3d at 1079.  That is precisely what was done in this
case.  And, based upon that analysis, the Forest Service
plausibly concluded that neither project would substantially
impact the human environment.

Based upon the record before it, the court necessarily
concludes that plaintiffs have not demonstrated that either the
Than or Batchelder Brook project is "closely similar" to projects
that would "substantially alter the undeveloped character of an
inventoried roadless area of 5,000 acres or more."  The Than
project involves vegetation management on a total of 929 acres,

54

424 acres of which fall within much larger areas inventoried for
roadless characteristics.  Than Project Decision Notice at 12.
See also Than EA, Than Vol. 3, Tab 6, page 3-114.  The Batchelder
Brook project is even smaller and calls for vegetation management
on a total of 380 acres, of which 139 acres fall within the much
larger South Carr Mountain IRA.  Batchelder Brook EA, B.B. Vol.
3, Tab 1, page 3-98.  Nothing about either of those relatively
small projects suggests that it will "substantially alter the
undeveloped character" of the affected IRA.  See, e.g., Than
Project Decision Notice at 12 ("Proposed actions included in [the
Than project] will not significantly alter the character of the
area or the qualities which qualified it for inclusion in the
[roadless] inventory. . . . [T]hese qualities would not be
affected because the harvests are of limited intensity and
minimal road systems will be used.").

Plaintiffs have not shown that the exception to the general
rule that such publication is unnecessary, codified at 40 C.F.R.
1501.4(e)(2)(i), applies in this case.  Consequently, the court
finds that the Forest Service was not obligated to publish the
Batchelder Brook and/or Than project FONSI for at least 30 days
prior to issuing the Notices of Decision.

## Conclusion

As noted earlier, the court is not asked to review the wisdom or advisability of either the Than or Batchelder Brook Vegetation Management Projects, nor is it asked to determine whether there are other, perhaps less intrusive, means by which to achieve the goals embodied in the Forest Plan and/or the proposed projects.  The narrow question before this court is a legal one: whether the Forest Service complied with its statutory and regulatory obligations when it decided to implement those two site-level forest management projects.  And, the standard by which the court must measure the Forest Service's challenged conduct is decidedly deferential.  This court does not substitute its judgment on the merits of the projects for that of the Forest Service.  Instead, its review is limited to determining "whether the [Forest Service] has considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Dubois, 102 F.3d at 1284 (quoting Baltimore Gas & Elec., 462 U.S. at 105).  It has.

For the reasons set forth above, as well as those discussed in defendants' legal memoranda and the memoranda submitted by the amici, the court concludes that plaintiffs have not shown that the Forest Service violated NEPA, NFMA, or the APA in approving

the Than and Batchelder Brook site-level projects.  Plaintiffs'
motion for summary judgment (document no. 28) is denied and
defendants' motion for summary judgment (document no. 46) is
granted.  The Clerk of Court shall enter judgment in accordance
with this order and close the case.

   **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    Chief Judge

June 6, 2008

cc:  John T. Alexander, Esq.
     Anthony I. Blenkinsop, Esq.
     John S. Harbison, Esq.
     Kristin A. Henry, Esq.
     Cynthia S. Huber, Esq.
     Eric E. Huber, Esq.
     Bradford W. Kuster, Esq.
     Jared M. Margolis, Esq.